**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| RANGER ENVIRONMENTAL SERVICES LLC, | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | CIVIL ACTION 1:23-00297-KD-M |
| | ) | |
| CARL FOEHL, *et al.*, | ) | |
| Defendants. | ) | |

**ORDER**

This matter is before the Court on Plaintiff's Motion and Memorandum in Support of Preliminary Injunction (Doc. 15); Defendants' Response (Doc. 25), and the September 19-21, 2023 evidentiary hearing (including exhibits (Doc. 31)); Defendants' Motion to Dismiss (Doc. 18), Plaintiff's Response (Doc. 35), and Defendants' Reply (Doc. 38); and Plaintiff's First Amended Complaint (Doc. 34).

**I.    Factual Background**

    **A.    The Parties**

Plaintiff Ranger Environmental Services, LLC (Ranger) is an Alabama limited liability company with its primary location in Mobile, AL, with non-party Alabama resident members James Timothy Turner (President) and Gypsy Elana Turner (Vice-President).  (Doc. 5). Non-party Clay Turner is Ranger's General Manager, and oversees all operations vetting, customer relations, overall performance, etc. (Hrg. Test. Clay Turner; Hrg. Test. Elana Turner; Hrg. Test. Foehl).  Ranger conducts business in Mobile, Jefferson, and Morgan Counties in AL; in Fulton County, GA; and Jackson and Harrison Counties in MS. (Doc. 34). Ranger's annual revenues derive, in substantial part, from performing environmental, industrial, civil infrastructure, and commercial services for its customers. (Hrg. Test. Clay Turner). However, Ranger began performing maritime cleaning services in 2015 (*e.g.*, debunking, offloading fuels/petroleum, cleaning maritime spaces, preparing tanks on vessels for hot

work, vacuum hydro-blasting in tanks (tank cleaning), and waste transportation) to customers in various maritime markets including Alabama. (Id.)

Defendant Wellbuilt Environmental Solutions, LLC (Wellbuilt) is an Alabama limited liability company with offices in Mobile, AL and Gonzalez, LA; its members are non-party Alabama residents Sonya Gomel and Spencer Tuel. (Docs. 20, 33). Wellbuilt provides environmental, industrial, commercial, and maritime cleaning services, including vacuum hydro-blasting, tank cleaning, and waste transportation, and does so within various maritime markets including Alabama and Louisiana. Wellbuilt is a maritime cleaning services competitor of Ranger. (Hrg. Test. Salley; Hrg. Test. Clay Turner; Hrg. Test. Foehl; Hrg. Test. Elana Turner).

Defendant Carl Foehl (Foehl) is an Alabama resident and former employee of Ranger from 2/9/16-7/9/23 (Maritime Manager). (Hrg. Test. Foehl). Following his departure from Ranger, Foehl became Wellbuilt's Louisiana Maritime/Marine Manager, where he is currently employed. At present, Foehl works out of Wellbuilt's primary facility in Gonzalez, LA, as well as out of Mobile, AL location (remotely, as his home is based there), soliciting potential maritime customers in Louisiana as he builds the division for Wellbuilt. (Hrg. Test. Foehl; Hrg. Test. Salley).

Defendant Kendall Salley (Salley) is an Alabama resident and former employee of Ranger from 8/14/14-5/5/21 (Creola Alabama Branch Manager, then General Manager). (Doc. 33; Hrg. Test. Salley). Salley was Foehl's supervisor during the time both were employed at Ranger. (Hrg. Test. Salley). Following his departure from Ranger, Salley became Wellbuilt's General Manager, and currently works in the Mobile, AL office. (Id.)

### B.   The Litigation

This litigation is rooted in the circumstances surrounding Foehl's July 2023 resignation from Ranger and his subsequent (and immediate) employment with Wellbuilt, Ranger's competitor in the maritime cleaning services business. Generally, Ranger alleges that around that time, Foehl stole company trade secrets and breached his non-compete agreement.  Ranger also alleges that Foehl,

Wellbuilt, and Salley misappropriated company trade secrets, improperly solicited company customers and employees, and improperly competed with the company to unlawfully advantage Wellbuilt.

## II.    <u>Procedural</u> <u>Background</u>

On August 3, 2023, Plaintiff Ranger Environmental Services, LLC (Ranger) initiated this action against Carl Foehl (former Ranger employee) (Foehl), Kendall Salley (former Ranger employee) (Salley), and Wellbuilt Environmental Solutions LLC (Wellbuilt), pursuant to <u>Federal</u> <u>Rule</u> <u>of Civil Procedure</u> Rule 65, 18 U.S.C. § 1836 *et seq.* (the *Federal Defend Trade Secrets Act* (DTSA)),[1] and <u>Ala</u>. <u>Code</u> §§ 8-27-4(a)(1)(a) and 8-1-195 (the *Ala Trade Secrets Act* (ATSA)).   Ranger filed a Verified Complaint, Motion for Temporary Restraining Order (TRO), Motion for Preliminary Injunction (PI), and Motion for Civil Seizure.  (Docs. 1, 3).  In the Verified Complaint, Ranger alleges nine (9) counts against the Defendants: misappropriation of trade secrets DTSA (18 U.S.C. §§ 1831) and ATSA (Ala. Code §§ 8-27-1) by all Defendants (Counts One and Two); conspiracy to violate the DTSA (Count Three) by all Defendants; breach of contract by Foehl relative to his employment

---

[1] As explained in 1 Computer Software Agreements: Forms and Commentary § 4:4 (Jul. 2023 Update) (emphasis added):

> On May 11, 2016, the … DTSA was signed into law … to provide a federal cause of action to private companies for trade secret misappropriation…. A uniform, nationwide set of standards for protecting trade secrets and establishes a private right of action to sue in federal court….
>
> The DTSA does not preempt, and instead …. Co-exist[s] with…. State-by-state implementations of the Uniform Trade Secrets Act … and other state laws currently governing trade secret disputes.
>
> ***
>
> …. Under the DTSA, a court may grant an injunction to prevent any actual or threatened misappropriation, provided the order does not prevent a person from entering into an employment relationship or otherwise conflict with applicable state laws prohibiting restraints on trade. Instead, the DTSA states that any injunction that would prevent or restrict a person's employment cannot conflict with state law regarding restraints on the lawful profession, trade or business, and must be "based on evidence of threatened misappropriation and not merely on the information the person knows."

agreement with Ranger (Count Four); fraud, misrepresentation, deceit, and suppression against Foehl (Count Five); breach of fiduciary duties against Foehl (Count Six); tortious interference against Foehl (Count Seven); tortious interference against Salley and Wellbuilt (Count Eight); and breach of contract by Foehl (a $5,200 loan by Ranger) (Count Nine).

On August 4, 2023, the motions were set for an evidentiary hearing on August 14, 2023.  (Doc. 7).  On August 9, 2023, the parties jointly moved to convert the hearing into a status conference and to hold certain settings in abeyance suggesting they had reached an agreement as to some claims, and the request was granted. (Docs. 9, 10). On August 11, 2023, the parties jointly filed a motion for entry of a consent preliminary injunction order as to certain claims and a briefing schedule for the remaining disputed issues. (Doc. 11). On August 14, 2023, a Status Conference was held, at which time the parties represented that they were in agreement as to certain issues/claims but wished for the case to continue as to the remaining issues.  At the hearing, the Court informed the parties that they could execute a private settlement outside of the undersigned's imprimatur because a consent order or decree would not be granted given that such entails findings of fact and conclusions of law as well as are generally disfavored. The Court notified the parties further, that injunctive relief would not be considered without a full evidentiary hearing and a determination as to whether Ranger had met its Rule 65 burden. The parties' motion was denied and the motion for TRO/PI/Seizure was rendered moot. (Docs. 12, 13).

On September 1, 2023, Ranger moved for entry of a temporary/permanent preliminary injunction related to Counts 1-2 and 4 of the Verified Complaint. (Doc. 15). A September 19, 2023 evidentiary hearing was scheduled. (Doc. 16). On September 7, 2023, Defendants filed a motion to dismiss certain claims in Ranger's Verified Complaint and filed an Answer. (Docs. 18, 19). On September 11, 2023, Defendants filed a response to Ranger's injunctive request.  (Doc. 25).

On September 28, 2023, Plaintiff filed a First Amended Complaint (Doc. 34). Generally speaking, the First Amended Complaint appears to differ from the Verified Complaint only in that Count Three alleges conspiracy against Defendants under the ATSA (no longer under the DTSA);

Count Five alleges Foehl intentionally misrepresented whether he would leave Ranger to work for Wellbuilt; Count Six's breach of fiduciary duty claim focuses on Foehl's alleged breach of the agreement; and Count Nine (breach of contract against Foehl - $3,250 loan) has been removed. (Id.)

On September 29, 2023, Plaintiff filed a Response (Doc. 35) to Defendants' motion to dismiss. From September 19-21, 2023, an evidentiary hearing was held at which time Ranger presented the testimony of company Vice-President Elana Turner and company General Manager Clay Turner; and Defendants presented the testimony of Carl Foehl, Kendall Smalley, and computer forensic expert Michael Black.  On October 6, 2023, Defendants filed a Reply. (Doc. 38).

### III.   <u>First Amended Complaint & Motion to Dismiss</u>

While Defendants' motion to dismiss certain claims in Plaintiff's Verified Complaint was pending, Plaintiff filed a First Amended Complaint. As such, the Verified Complaint has been superseded and replaced, and the operative complaint is Plaintiff's First Amended Complaint. <u>Alonso v. Public Health Trust of Miami-Dade Cty.</u>, 2023 WL 5955117 (11th Cir. 2023) (citing <u>Pintando v. Miami-Dade Housing Agency</u>, 501 F.3d 1241, 1243 (11th Cir. 2007)). The Verified Complaint is "a legal nullity." <u>Hoefling v. City of Miami</u>, 811 F.3d 1271, 1277 (11th Cir. 2016). Thus, Defendants' motion to dismiss, seeking to dismiss claims in a now superseded pleading, is **MOOT.** <u>DeSisto College, Inc. v. Line</u>, 888 F.2d 755, 757-758 (11th Cir. 1989) (finding proper the mooting of defendant's motion to dismiss a complaint as plaintiff filed an amended complaint); <u>Perkins v. Kushla Water Dist</u>., 2013 WL 4511329, *1 (S.D. Ala. Aug. 23, 2013) (same). <u>See</u> <u>also</u> <u>e.g.</u>, <u>Phoenix Entertainment Partners, LLC v. Jellyfish, LLC</u>, 2018 WL 10517181, *1 (N.D. Fla. Apr. 12, 2018) (same); <u>Caring People, Inc. v. Dunn,</u> 2015 WL 12720331 (S.D. Fla. Nov. 4, 2015) (same); <u>Geathers v. Bank of Am., N.A.</u>, 2015 WL 348852 (N.D. Ga. Jan. 26, 2015) (same).

**IV.**    <u>**Motion for Temporary & Permanent Preliminary Injunction**</u>[2]

Ranger moves for injunctive relief based on its claims regarding: 1) Defendants' trade secret misappropriation (DTSA, 18 U.S.C. §§ 1831, *et seq.* and the ATSA, <u>Ala</u>. <u>Code</u> §§ 8-27-1, *et seq*. which provide remedies for the misappropriation of a "trade secret" 18 U.S.C. § 1836(b)(1), <u>Ala</u>. <u>Code</u> § 8-27-3); and 2) Foehl's breach of the non-solicit and non-compete covenants of his employment agreement with Ranger under Alabama law (breach of contract).[3] Ranger argues that the "Defendants' refusal to return and refrain from using and misappropriating its trade secrets after it previously agreed to do somerits injunctive relief.  (Doc. 15 at 26).

At the evidentiary hearing, Ranger specifically requested the Court issue an injunction that prohibits Foehl from: 1) using Ranger's trade secrets; 2) soliciting Ranger's employees; 3) competing against Ranger in restricted geographic areas including Mobile, AL; and 4) working under Salley and with Salley (or if allowed to be remote not be allowed to directly report to any Mobile, AL employees or work with Mobile, AL employees). To obtain injunctive relief, Ranger need only show a substantial likelihood of success on at least one of these claims. <u>Schiavo ex rel. Schindler v. Schiavo</u>, 357 F.Supp.2d 1378, 1384 (M.D. Fla. 2005); <u>Sapphire Consulting Servs. LLC v. Anderson</u>, 2021 WL 1053276,*3 (M.D. Fla. Feb. 12, 2021).

At the outset, while some courts have found that the filing of an amended complaint moots a pending motion for preliminary injunction (just as with a motion to dismiss), other courts construe the motion as referencing and relying on the newly operative complaint. The undersigned has considered the most efficient use of court resources, judicial economy, the nature of the relief sought, and the *extensive* (3-day) preliminary injunction hearing. To moot the motion would likely result in an entirely

---

[2] Ranger makes no attempt to establish its claims and/or entitlement to injunctive relief as to either Defendants Salley and/or Wellbuilt, instead focusing exclusively on Foehl. And this includes at the September 19-21, 2023 evidentiary hearing, as noted by the Court on the record. As such, any request for injunctive relief as to Defendants Salley and/or Wellbuilt is **DENIED.**

[3] Ranger does not address its other claims in the motion; thus, they are not at issue.

new round of briefing, the parties incurring unnecessary additional expenses, duplicative consumption of court resources, and undermine any potential injunctive relief based on "imminent" harm. Upon consideration, and given the unique circumstances of this case, even though the Plaintiff filed the First Amended Complaint after filing its motion for preliminary injunction, the Court finds it proper to refer to the factual allegations in the First Amended Complaint as such appear equally applicable to the pending motion. "As long as the issues raised in the [preliminary injunction] motion apply equally to the original and amended complaints, the court may simply consider the motion as being addressed to the amended pleading. To hold otherwise would be to exalt form over substance." 16 Front St. LLC v. Miss. Silicon, LLC, 2015 WL 4665223, *5 n.8 (N.D. Miss. July 30, 2015). See also JBF Interlude 2009 Ltd–Israel v. Quibi Hldgs., LLC, 2020 WL 3953893, *6 (C.D. Cal. Jul. 13, 2020) (a trade secrets case) ("[w]here the claim and prayer for injunctive forming the basis for a motion for preliminary injunction remains in an amended pleading and the motion … does not rely on factual allegations that substantially differ between the superseded and amended complaint, construing a motion … relying on the amended pleading is appropriate[] … requiring the refiling … would be a needless waste of party and judicial resources. … the Motion is not rendered moot … It shall instead be construed as relating to … the operative complaint only as to the existence of the trade secrets claim … and the prayer for injunctive relief—not as to any materially different factual allegations therein[]").

Regarding the DTSA, Section 1836(b)(3)(A)(i) provides for an injunction "to prevent any actual or threatened misappropriation" of a trade secret "on such terms as the court deems reasonable" subject to additional conditions/requirements. "A party can also seek an award of damages "for actual loss caused by the misappropriation of the trade secret" and twice the amount of damages if the trade secret was "willfully and maliciously appropriated." 18 U.S.C. § 1836(b)(3)(B)(i)(I) & (C); M5 Mgt. Servs., Inc. v. Yanac, 428 F.Supp.3d. 1282, 1289 (N.D. Ala. Dec. 12, 2019). Similarly, the ATSA prohibits the misappropriation of trade secrets, Ala. Code § 8-27-3, as defined by the statute Ala. Code § 8-27-2(1), and Alabama law provides injunctive relief to prevent "as may be appropriate with respect

to any actual or threatened misappropriation of a trade secret[]" Ala. Code § 8-27-4(a)(1)a. Additionally, "if a claim of the misappropriation is made in bad faith … a motion to terminate an injunction is made or opposed in bad faith, or the trade secret was willfully and maliciously misappropriated, award reasonable attorney's fees to the prevailing party." 18 U.S.C. § 1836(b)(3)(D); Ala. Code § 8-27-4(a)(2). Moreover, as for breach of an employment agreement, Alabama law provides for injunctive relief in certain circumstances. See, e.g., DJR Assoc., LLC v. Hammonds, 241 F.Supp.3d 1208, 1231 (N.D. Ala. Mar. 13, 2017) (issuing injunctive relief as the evidence revealed the non-movants "carr[ied] on or engag[ed] in" business with the movant's customers).

A preliminary injunction is the avenue to "preserve the status quo until the merits of the controversy can be fully and fairly adjudicated." Suntrust Bank v. Houghton Mifflin Co., 268 F.3d 1257, 1265 (11th Cir. 2001). A district court may grant such relief only if the movant shows that: 1) a substantial likelihood of success on the merits; 2) irreparable injury will be suffered unless the injunction issues; 3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the non-movant; and 4) if issued, the injunction would not be adverse to the public interest. FF Cosmetics FL, Inc. v. City of Miami Beach, 866 F.3d 1290, 1298 (11th Cir. 2017); McDonald's Corp.v. Robertson, 147 F.3d 1301, 1307 (11th Cir. 1998) (same). However, "[a] preliminary injunction is an extraordinary and drastic remedy and should not be granted unless the movant clearly establishe[s] the burden of persuasion as to each of the four prerequisites." FF Cosmetics, 866 F.3d at 1298 (internal quotes omitted)).  Preliminary injunctions are not to be issued unless the movant has "clearly established" the burden of persuasion on each element. Four Seasons Hotels & Resorts, B.V. v. Consorcio Barr, S.A., 320 F.3d 1205, 1210 (11th Cir. 2003) (quotations and citation omitted). Injunctions are "the exception, not the rule." Id.

In the context of the DTSA "[i]t is not appropriate to presume irreparable injury '[w]here a misappropriator seeks only to use [trade] secrets -- without further impairment or irreparable impairment in value -- in pursuit of profit.' Faiveley Transp. Malmo AB v. Wabtec Corp., 559 F.3d

110, 118–19 (2d Cir. 2009)." KCG Hldgs., Inc. v. Khandekar, 2020 WL 1189302, *16 (S.D.N.Y. Mar. 12, 2022). As set forth in HB&G Building Products, 2022 WL 1913604 at *6 (internal quotation omitted): "[a]n injury is irreparable only if it cannot be undone through monetary remedies. *Ne. Fla. Chapter of Ass'n of Gen. Contractors of Am. v. City of Jacksonville*, 896 F.2d 1283, 1285 (11th Cir. 1990)." Often however, "[r]emedies at law are not sufficient to compensate for [trade secret] disclosure because no amount of money damages will guarantee that [a defendant] does not further share [a plaintiff's] trade secret with others." Knox Trailers, Inc. v. Maples, 2023 WL 2570970, *6 (E.D. Tenn. Feb. 14, 2023) (internal citation omitted)).

Requiring that a movant establish a substantial likelihood of success on the merits of its claims is "generally the most important[] factor." Dream Defenders v. Governor of the State of Fla., 57 F.4th 879, 889 (11th Cir. 2023); Norwegian Cruise Line Hldgs. Ltd. v. State Surgeon General, Fla. Dept. of Health, 50 F.4th1126, 1159 (11th Cir. 2022); Gonzalez v. Governor of Ga., 978 F.3d 1266, 1271 at n. 12 (11th Cir. 2020). Still, "preventing irreparable harm in the future is the *sine qua non* of injunctive relief." Alabama v. U.S. Army Corps of Engineers, 424 F.3d 1117, 1133 (11th Cir. 2005). In otherwords, even if Ranger establishes a likelihood of success on the merits, "the absence of a substantial likelihood of irreparable injury would, standing alone, make preliminary injunctive relief improper." Siegel v. LePore, 234 F.3d 1163, 1176 (11th Cir. 2000); Northeastern Fla. Chapter of Ass'n of Gen. Contractors of Am., 896 F.2d 1283, 1285 (11th Cir. 1990) ("plaintiff's 'success in establishing a likelihood it will prevail on the merits does not obviate the necessity to show irreparable harm[]'" (citation omitted)). But, for there to be a likelihood of irreparable injury due to trade secret misappropriation, there must first be a trade secret which has been misappropriated (*i.e.*, a substantial likelihood of success on the merits of the claim).

In determining this, the Court keeps in mind that "when ruling on a preliminary injunction, 'all of the well-pleaded allegations [in a movant's] complaint and uncontroverted affidavits filed in support of the motion for a preliminary injunction are taken as true.' *Elrod v. Burns*, 427 U.S. 347, 350 n.1 …

(1976). The court may also consider supplemental evidence, even hearsay evidence, submitted by the parties. *See Levi Strauss & Co. v. Sunrise Intern. Trading, Inc.*, 51 F.3d 982, 985 (11th Cir. 1995)." Alabama v. United States Dept. of Commerce, 546 F.Supp.3d 1057 (M.D. Ala. Jun. 29, 2021). *Nevertheless*, "where facts are bitterly contested and credibility determinations must be made to decide whether injunctive relief should issue, an evidentiary hearing must be held." McDonald's Corp. v. Robertson, 147 F.3d 1301, 1312 (11th Cir. 1998). Such a hearing is often necessary in trade secret litigation because "whether an item is a trade secret is 'normally resolved by a fact finder after full presentation of evidence from each side.' *Lear Siegler, Inc. v. Ark-Ell Springs, Inc.*, 569 F.2d 286, 288–89 (5th Cir. 1978)." Howmedica Osteonics Corp. v. Alphatec Spine, Inc., 2022 WL 3136837, *7 (M.D. Fla. Jun. 17, 2022). At an evidentiary hearing, the Court sits as both factfinder and credibility assessor. Four Seasons Hotels & Resorts, B.V. v. Consorcio Barr, S.A., 320 F.3d 1205, 1211 (11th Cir. 2003). "Highly disputed factual issues may cast doubt on the plaintiff's substantial likelihood of success." Castellano Cosmetic Surgery Ctr., P.A. v. Rashae Doyle, P.A., 2021 WL 3188432 (M.D. Fla. Jul. 28, 2021).

## V.    Findings of Fact[4]

### A.    Foehl's Employment and the Employment Agreement

In late 2015, Ranger decided to pursue maritime cleaning services.  In February 2016, Ranger hired Foehl as its first Maritime Division Manager. (Hrg. Test. Clay Turner). Ranger learned of Foehl in January 2016 via Aaron Oil, one of its customers. (Id.) At that time, Foehl was an Aaron Oil employee handling maritime services.  After Aaron Oil decided to shut down its maritime business, Aaron Oil recommended Foehl to Ranger as an "excellent estimator" for bidding maritime services,

---

[4] **The findings of fact are for purposes of determining whether a preliminary injunction is warranted.  These findings may change upon further information being presented to the Court and do not constitute a final determination by the undersigned.**

adding that he would immediately bring business to the company from jobs he had already secured with BAE (jobs he already bid which were accepted) as well as due to his established relationships with BAE. (Hrg. Test. Clay Turner). Ranger followed Aaron Oil's recommendation and hired Foehl. (Id.)

As Maritime Manager Foehl's responsibility was to oversee all maritime activity for Ranger – deal with customers, prepare bids, execute the jobs (basic project management). (Id.) Part of Foehl's job with Ranger was also to develop relationships with Ranger's customers, learning customers' needs and specifications, and serve as the point of contact for customers, and obtain contact information for point people with Ranger's customers.  (Hrg. Test. Foehl; Hrg. Test. Elana Turner; Hrg. Test. Clay Turner). Foehl obtained cell phone numbers through the relationships Ranger developed with those customers over time (numbers not published or not public phone numbers). (Id.) Ranger supplied Foehl a cellular phone, laptop, and email address, to assist in his tasks. Foehl was expected to maintain Ranger's customer contact information on the cell phone provided.

As a condition of his employment with Ranger, Foehl was required to sign an Employee Confidentiality Non-Solicitation-Non-Compete Agreement (the Agreement). (Hrg. Test. Clay Turner; Hrg. Test. Foehl).  The Agreement provides, in part, as follows:

> All of the information listed below, including any materials, documents, computer records, or other medium embodying such information, whether disclosed orally or otherwise, shall be considered as proprietary and confidential information and trade secrets of Employer (… "proprietary and confidential information" of Employer). All such information, records, lists, files and other books and records, in whatever form, whether prepared by Employer or Employee is the exclusive property of Employer … the term "proprietary and confidential information" includes …:
> A. Information and documentation that is not "public information."
> B. Policies, procedures and techniques concerning employer's business.
> C. Pricing information.
> D. Personnel files.
> E. Customer lists and related customer information.
> F. Marketing strategy.
> G. Long and short range planning of Employer.
> H. Information, which is subject to evidentiary privilege, including, but not limited to, attorney client privilege, work product doctrine and self-evaluation.

> I.   Methods, processes, formulae, compositions, inventions, machines, computer programs and research projects
>
> ***
>
> With the exception of potential customer, BAE, Employee agrees and covenants that he will not solicit or do business with, or attempt to solicit or do business with, any of Employer's customers, or prospective customers, as of the date of Employee's termination of employment, regardless of whether such termination of employment is by the Employee or the Employer, and is with or without cause, for a period of two (2) years after termination. Further, Employee agrees that he will not in any way directly or indirectly, for himself or on behalf of other persons, firms, corporations or other entities, solicit, divert, or take away, or attempt to solicit, divert or take away any of the customers or prospective customers of Employer, as of the date of Employee's termination of employment, for a period of two (2) years after termination.
>
> ***
>
> [Foehl shall not] Directly or indirectly, carry on or engage in the same or a similar line of business as carried on by Employer, or engage in work, or be employed to work, for any individual, firm or corporation engaged or carrying on such line of work or a similar line of business as carried on by Employer, in any geographic location in which Employer carries on a like business, including, but not limited to, Mobile and Baldwin Counties, Alabama.
>
> ***
>
> Employee agrees that he will not employ or solicit the employment directly or indirectly, of any of Employer's employees, agents, servants, and representatives, or any of the same, for any person or entity, during the period of this Agreement, and for a period of two (2) year after the termination of Employee's employment with Employer, whether said termination is by Employee or Employer, and is with or without cause.

(Doc. 1-1 at Sections I.B., III.A, III.D, IV.B).

The Agreement also provides that Foehl will not "copy or reproduce in any way, directly or indirectly, partially or completely, the proprietary and confidential information or any portion thereof[]" and will "not directly or indirectly use, for any purpose, Employer's proprietary and confidential information for his own benefit or for the benefit of any third party." (Id. at Section I.E.3, I.E.5). Further, when his employment ends, the Agreement requires that Foehl deliver all company documents to Ranger. (Id. at Section I.E.6).

Of note, BAE was carved out of the Agreement for Foehl, because he was bringing with him to Ranger, the customer relationships and contacts he had already developed with BAE, and had specifically requested to maintain that relationship if things did not work out at Ranger. (Hrg. Test. Clay Turner). Per Foehl, "I was bringing .. BAE.. a big customer[]" to Ranger. (Hrg. Test. Foehl).

And according to Ranger, BAE later became Alabama Shipyard. (Hrg. Test. Clay Turner).  Moreover, per the Agreement, Foehl was required to promptly deliver all Ranger documents to the company when he left the company's employment. (Hrg. Test. Foehl).

**B.**    **July 2023- Foehl's departure from Ranger**

In July 2023 Foehl was having financial hardships. (Hrg. Test. Foehl). This prompted Foehl to consider other employment. (Id.) Salley and Foehl approached each other around the same time, discussing working for Wellbuilt instead. (Hrg. Test. Salley).  Specifically, during the first week of July 2023, Foehl called former Ranger employee Salley, then employed at Wellbuilt, to discuss potential employment at Wellbuilt.  Salley indicated that Foehl would be hired to grow the maritime industry in LA along the Mississippi River. (Hrg. Test. Foehl). Before he resigned, Foehl told Ranger VP Elana Turner he was leaving to accept a job with Wellbuilt working in Louisiana; she told him it would not violate the non-compete agreement. (Id.)

During the last 9 days of his employment with Ranger, Foehl printed out some outstanding request for maritime cleaning services bids and started preparing calculations, but he did not complete them or put his calculations or numbers on a bid sheet. (Hrg. Test. Foehl). Instead, Foehl left his handwritten calculations on his desk at the company office when he left. (Id.) Foehl took none of these bids with him. (Id.)

On his last day at Ranger, Foehl left the phone and laptop on the branch manager's desk at the company office. (Id.) Foehl did not copy or download anything from Ranger's computer server onto his external hard drive, did not take anything with him from the office, did not delete any data from the server, did not copy any data from his phone or laptop, did not delete any emails from his laptop, and did not take any draft bids. (Id.) However, some of Ranger's customer contacts which had been on the phone had already been accidentally deleted. (Id.) Foehl explained that before returning the phone, he purchased a new personal phone and his wife had tried to help him remove personal texts, personal contacts, and personal photos from the Ranger phone to place on his new personal phone, but her

attempt resulted in an inadvertent deletion of some Ranger customer texts and customer contacts (but not emails) from the Ranger supplied phone. (Id.)  However, Foehl had already shared all the customer contacts with Ranger's maritime superintendent before he left, and he cured this accidental deletion by subsequently providing to Ranger everything that had been on the cell phone (after litigation commenced). (Id.) Foehl no longer has any Ranger customer contacts or texts on his personal phone. (Id.) As to contact names for Ranger's customers, Ranger agrees now that all of that has been provided to Ranger.  (Hrg. Test. Elana Turner).

     **C.**     <u>**Foehl's Employment at Wellbuilt**</u>

On Monday July 10, 2023, the first business day after he resigned, Foehl began employment with Wellbuilt as its Louisiana Maritime Manager. (Hrg. Test. Foehl). Foehl's supervisor is Salley – former Ranger employee and Wellbuilt's current General Manager based in Mobile, Al.  (Id.) Salley was hired to start the industrial division at Wellbuilt, and later started the maritime division. (Hrg. Test. Salley).  Wellbuilt's facilities are in Gonzalez, LA, Theodore, AL, and Vinemont, AL with an office in Mobile, AL. (Id.) Wellbuilt is a competitor of Ranger. (Id.)

Foehl did not believe working for Wellbuilt would violate his non-compete with Ranger because Ranger does not work in Louisiana. (Hrg. Test. Foehl). Also, Foehl is Wellbuilt's Louisiana Maritime Manager and does not solicit customers in Ranger's territory and/or Mobile, AL.  However, Foehl works on a day-to-day basis with Salley. (Id.)  Salley does solicit customers in Ranger's territory. In his new role Foehl spends about 60% of his time at the Mobile, AL office and 40% of the time at the LA office. (Id.) Foehl is presently building relationships with customers in Amelia, New Orleans, and Morgan City Louisiana so Wellbuilt can move into that revenue stream.  When Foehl works at Wellbuilt's Mobile, AL office, he is still soliciting Louisiana customers.  Foehl only works at the Mobile location because it is where all his materials are located; but he could also perform that work anywhere, including from home.  (Id.)

However, Foehl cannot move to Louisiana to work for Wellbuilt, as it would cause an undue hardship.  Specifically, he is sole source of income for his family of six, his wife is unemployed and cares for his older mother-in-law, and he cannot afford a second residence in Louisiana.  Per Foehl, his Wellbuilt job would terminate if he was prohibited from working from either his home in Mobile or the Mobile Wellbuilt office. (Id.)

Contrary to Ranger's assertions, there is no evidence that Foehl has shared Ranger confidential documents with anyone.  Nor is there credible evidence that Foehl has shared customer contacts with anyone at Wellbuilt or contacted any of Ranger's customers. (Id.) Moreover, Foehl credible testimony indicates he has not encouraged any Ranger employees to leave or offered any Ranger employees positions at Wellbuilt (including tank cleaner Russell). (Id.) Nor is there credible evidence that Foehl suggested or encouraged Ranger customers to do business with Wellbuilt. (Hrg. Test. Foehl).


**D.      The Maritime Bid Process**

Ranger acknowledges that when Foehl came to the company, he had already been in the maritime cleaning business for several years and had bid maritime cleaning services for shipyards in and around Mobile, AL and MS for a number of years -- including bidding jobs at BAE (now Alabama Shipyard). (Hrg. Test. Clay Turner). Ranger also acknowledges that it hired Foehl based on Aaron Oil's high regard for his established maritime estimating/bidding skills, reflected by his starting position as the company's new maritime division's Maritime Manager.

There is no dispute that for the first five to six years of Foehl's employment (February 2016 through either late 2022 or January/February 2023), Foehl used his own maritime bid process to bid maritime cleaning services jobs for Ranger, with little or no involvement by the company (whether VP Elena Turner and/or GM Clay Turner). Indeed, Ranger VP Elana Turner testified that Foehl worked for six years and bid maritime cleaning services jobs for the company without any involvement by her. (Hrg. Test. Elana Turner).

Prior to joining Ranger, Foehl had been employed in a managerial capacity in approximately 15 positions over his career – positions in which he performed basic project management, supervised employees, prepared bids, analyzed business profitability, analyzed profit and loss generally, learned how to clean tanks, developed customer relations and handled communication. (Hrg. Test. Foehl). Foehl first began working in the maritime industry around 2005, first took on a management role in 2008, and first began tank cleaning work around that time. (Id.)  Notably, in 2008, Foehl learned how to bid maritime cleaning services and was taught the bid process while employed with Liquid Environmental Solutions (LES). (Id.) This is when, where, and how, Foehl developed his maritime bid process. (Id.) After LES, Foehl worked for Aaron Oil and continued performing maritime cleaning services and using the bid process he had developed and used at LES. (Hrg. Test. Foehl). Subsequently, Foehl used the same maritime bid process at Ranger to prepare its maritime cleaning services bids. (Id.) While employed at Ranger, Foehl relied exclusively on the bid process he had been using for years. (Id.)

Foehl describes his maritime bid process as follows. After receiving a tank cleaning specification from a potential customer, he reads it over, creates capacities, and converts capacity to cubic meters and uses a cubic meter rater formula to decide upon a price (bid).  (Hrg. Test. Foehl). "The formula that I used when Ranger hired me was a formula that I developed. It wasn't a magical number I pulled out of a hat. I had a formula I used and they were aware of the formula I used." (Id.) Foehl considered production rates, disposal costs, etc. when he prepared bids because he knew what the charges were, as reflected in the bids he prepared over the years. (Id.) Foehl used certain cents per gallon, came up with the number of hours by going off tank capacity in cubic meters and using the amount he charged per cubic meter depending on the product in the tank and what type of tank. (Id.) "That was my main way of doing the process of coming up with a price." (Id.) Foehl used his experience and knowledge of production methods, as well as the time it took to do certain jobs when calculating bids. (Id.)

While Foehl generally took Ranger's profitability into consideration when he created the bids, he did not use any specific production rate for its customers, has never seen such a rate anywhere, and would not know where to find such rate. (Id.) And during the time Foehl prepared bids, Ranger did not disclose any specific company bid process or formula to him. (Id.) And while Ranger owner Tim Turner initially wanted to go over a few bids with him, due to their complex and confusing nature Tim quickly told Foehl instead to just "do what you got to do to make" money. (Id.) Ranger did not preapprove Foehl's maritime bids before he sent them out to customers, at least not until the last six (6) months of his employment when Elana Tuner began to review them.  (Hrg. Test. Foehl).

As illustration of Foehl's consistent use of his maritime cleaning services bid process while at Ranger (versus a different bid process or "formula" supplied by Ranger), he submitted – and testified about the similarities between two (2) bids: 1) a 2015 BAE Systems bid he prepared for Aaron Oil (Def's Hrg. Ex. 2) prior to his employment with Ranger, and 2) an undated (either 2022 or 2023) Alabama Shipyard bid that he prepared for Ranger while employed with Ranger (Plf's Hrg. Ex. 2 SEALED):

<u>Def's Ex. 2</u> (8/11/15 bid for Aaron Oil for BAE Systems):

1) Price per gallon ($.18/gallon (cost plus 20%)) he derived based on 20% markup, and this example is 6 months prior to his employment with Ranger so Ranger did not provide him with anything to come up with this bid. (Hrg. Test. Foehl).

<u>Plf's Ex. 2</u> (Undated Ranger bid for Alabama Shipyard):

1) Material price is Foehl's estimated consumables for that particular tank (PPE, gloves, etc.) and he derived the figures for this based on his own estimation of that cost based on his work experience; Ranger did not provide him with any process to derive material prices or figures but he developed his own process prior to Ranger and used his own process for this price estimation routinely for bids he prepared for Ranger. (Hrg. Test. Foehl).

2) Labor price $40/hour is not a rate that Ranger provided to Foehl, but is a rate he used before employment with Ranger. (Hrg. Test. Foehl).

3) Labor hours-while the figures are redacted, Foehl calculated this based on his formula (cubic meter rate), a formula that he possessed before coming to Ranger and Ranger did not give him any instructions, changes, processes, or new formula for labor hours to calculate bids. (Hrg. Test. Foehl).

4) Price per gallon – this is the price for disposal of material pulled off of ship and it is based on cost from disposal sites with markup. (Id.) Ranger did not give Foehl any instructions or process to come up with this number; instead, Foehl obtained the costs from the disposal sites and always marked it up 20% (something he determined, not Ranger) which is common in the industry. (Hrg. Test. Foehl).

Def's Ex. 3/Plf's Ex. 2 (SEALED):

1) Price per gallon - $.18/gallon same as other bids (same as Aaron Oil) (Hrg. Test. Foehl).

2) Gallon volume – Foehl estimated gallons that would be produced when cleaning a tank. Foehl uses a 2% percentage ratio to the volume of tank – but it is his formula. Ranger did not provide him with a formula for this, and he used the one he had used prior to employment at Ranger. (Hrg. Test. Foehl).

Essentially, according to Foehl, how he prepares a bid and what methodology he uses is reflected on the Aaron Oil bid sheet, which he later replicated on the Ranger bid sheet – it is "basically the same thing."  As, for example, he comes up with a labor price of $40/hour average and adjusts the price by labor hours for any particular time (he came up with the $40/hour rate early on at LES) and continued using that rate at Ranger). (Hrg. Test. Foehl). When comparing the two (2) bid sheets, there is no difference other than the company logos, which is consistent with Foehl's testimony that he used a bid process that he developed prior to employment with Ranger and which he continued to use while at Ranger. (Id.) Foehl testified that he did not reduce his bid method to writing, and the process exists only "in his mind." (Hrg. Test. Foehl). Foehl's bid process derives from what he has independently developed over the years due to his experience in the industry (e.g., labor price, material price, etc.). (Id.) However, nothing about the bid process that he knows and uses is particularly unique in the industry. (Id.)

Foehl testified credibly that Ranger never discussed with him and/or provided to him a secret bid formula, special/unique company maritime cleaning services bid process, and/or a company production rate to use with such. (Id.) Also, the maritime tank cleaning process used by Ranger is fairly standard in the industry and is not a special/unique formula. (Id.) Differences that may exist among competitors' bids simply come down to workload and manhours and different rates. (Id.)

Per Foehl, no one at Ranger ever directly communicated to him that the bids submitted to customers were confidential. Foehl never marked bids confidential before submitting, and no one at Ranger instructed him to mark bids confidential as such, etc. (Id.) Moreover, Defs' Hrg. Ex. 4 establishes that customers have, at times, disclosed competitors' bids to Foehl. (Id.)

In 2021, Ranger began using a system called Liquid Frameworks. (Hrg. Test. Clay Turner). According to Clay, some of Ranger processes and methods – and formulas -- were written down into this system (documenting successful methods/procedures to use in future bidding or job knowledge for supervisors that lacked the information), others were only discussed orally. (Id.) The Liquid Frameworks system is only available to Ranger employees, password protected, and only employees who have signed confidentiality agreements have access. (Id.) Before using this system, Ranger had a policy of maintaining all bids and documents on the company's server, asking its employees to store all files there. (Id.)

It was not until January/February 2023 that Foehl first learned of Ranger's Liquid Frameworks computer system.  (Hrg. Test. Foehl).  It is then that Foehl used this system for the first time and first saw that Ranger was incorporating cost into the Liquid Frameworks data to assess performance, i.e., to determine if he was making a profit for the company based on his bids and his bid process. (Id.) Around that time Ranger began providing him with cost data for bid calculations; however, he still did not use the Ranger data/information when he calculated his bids. (Id.) Instead, Foehl continued to use the bid process he had developed and used in the past based on his history/experience in the industry. (Id.)

According to Ranger, Ranger's bid formula is based on Clay Turner's method of how to calculate tank capacities, disposal fees, volume of product to remove, materials PPE required, how fast the waste from a tank or vessel can be removed(factors including Ranger's equipment), etc. (Hrg. Test. Elana Turner). Clay stated he developed this formula in 2022 after discussing with Foehl the method Foehl was using (which Clay described as "spit balling").  Thereafter, Clay states that Foehl was

instructed to use the production rates Foehl and Clay "came up with together" in his maritime bidding process for the company. (Id.).  However, no documentary evidence was presented regarding this formula as it pertains to maritime bids or Foehl's use of this formula or production rates in any bids while at Ranger.

Per Foehl, he never had a conversation with Ranger GM Clay Turner about reviewing maritime bids, about how to put bids together so Ranger could be profitable, or about a secret Ranger bid formula, and never even discussed maritime bidding with Clay. (Hrg. Test. Foehl). "It did not happen." (Hrg. Test. Foehl).

Despite the contradiction between Foehl and Clay, what is clear is that Foehl did not make modifications to his bid method while he was at Ranger. (Id.)  This is supported by Ranger VP Elana Turner's testimony.  In late 2022, Ranger VP Elana Turner became involved in Foehl's bid process for Ranger.  (Hrg. Test. Elana Turner).  According to Elana, at that time she talked with Foehl about putting quotes together for bids using Ranger's method to calculate different factors. (Id.) Elana was trying to understand how Foehl came up with his bids. (Id.) Elana learned that Foehl's bid process (and rates) did not relate to Ranger's method of calculation, and that he was using his own bid process. (Id.) Thereafter, Elana would work through her formula [presumably the allegedly secret formula and production rates] and then compare it to Foehl's bid price to make sure both were "about the same". (Id.)

Based on the evidence before the Court at this time, the undersigned finds Foehl's testimony credible that he is not in possession of any secret bid formula or production rates that was developed by Ranger.

### E.     Foehl's Work in Mobile

Wellbuilt has maritime contracts in Mobile, AL via the Alabama Shipyard, as well as Bollinger shipyard in Pascagoula, MS. (Hrg. Test. Salley). Once employed at Wellbuilt, Foehl discussed

maritime work with Salley. (Hrg. Test. Foehl). Specifically, Salley has questioned Foehl about his experience on certain ships in Mobile on which Wellbuilt intends to bid for work.  Foehl has shared his knowledge regarding the difficulty and specifics of cleaning the ships in the past.

Foehl does not assist Salley in submitting bids for work in the Mobile area. The only post-employment Mobile bid for which evidence was submitted indicating that Foehl was even peripherally involved was the Coastal Reliance bid (July 21, 2023 bid deadline).  (Hrg. Test. Smalley; Hrg. Test. Foehl). However, Foehl did not provide Salley with any past Ranger bids that he prepared and he did not work on the Coastal Reliance bid. (Hrg. Test. Foehl ("did not work on that job, did not prepare a bid for it.")). Instead, Salley prepared the bid on his own and then simply asked Foehl to look it over to see what he thought (to compare his bid to Foehl's bid method).  Foehl told him the bid was way too high in amount based on his experience.  (Hrg. Test. Foehl; Hrg. Test. Salley). (Id.) Salley also did not modify the bid after Foehl's comment.[5]  Foehl did not do any work on that bid on behalf of Ranger before he resigned. (Hrg. Test. Foehl). Foehl has had no involvement with that bid after July 21, 2023 deadline. (Hrg. Test. Foehl). And, there is no evidence that Foehl has assisted Wellbuilt with any other bids involving Ranger customers since this litigation was filed. (Hrg. Test. Foehl).  In sum, Ranger has no evidence that Foehl has used any proprietary bid information to assist Wellbuilt in competing against Ranger.

### F.    **Foehl's External Hard Drive**

While employed with Ranger, Foehl possessed and used a personal external hard drive to store company documents he created, as well as to store personal information. (Hrg. Test. Foehl). When he first started with Ranger, Foehl was often in the field and lacked access to the company server and so

---

[5] According to Ranger VP Elana Turner, Ranger's bid on Coastal Reliance matter was around $35,000 for the tug. (Hrg. Test. Elana Turner). In contrast, Wellbuilt's bid (Defs Ex. 9) was significantly higher -- approximately $78,000 for the tug.

used this external hard drive instead to produce documents and add information needed for reference. (Id.) Placing Ranger documents on his hard drive simply became Foehl's practice, rather than uploading or creating documents directly on the Ranger company server. (Id.) Ranger's Vice President Elana Turner as well as its General Manager Clay Turner were aware of Foehl's practice in this regard and never instructed him to stop using the hard drive and/or to maintain his bid documents differently. (Hrg. Test. Foehl; Hrg. Test. Elana Turner (as to her)). While an employee, no one at Ranger told Foehl not to keep his bids on this hard drive, no one demanded he take information off of the hard drive and place such on the company server, his hard drive was not password protected, and Ranger did not instruct him to add a password. (Hrg. Test. Foehl). However, Foehl understood that he was required to maintain these documents on Ranger's server. (Id.)

Additionally, Foehl admits that he took his external hard drive with him when he left Ranger's employ and that the hard drive contained company documents. (Hrg. Test. Foehl). As to the contents, Plf's Hrg. Ex. 3 and Defs' Hrg. Ex. 5[6] list the documents (files) on the hard drive. (Hrg. Test. Foehl). Although not entirely clear, the documents on the hard drive at issue appear to have contained only the bid amount (pricing document) that the company supplied to the customer for the bid.  (Id.) One example is Plf's Hrg Ex. 2, a pricing document and example of what he took on his external hard drive (but not the 600 pages of bid specifications). As confirmed by Ranger's VP Elana Turner, without specifications very little can be discerned from the bid price.  Ranger has presented no evidence to show that Foehl had Ranger's specifications on his hard drive, emails, etc. (Id.)

The other document referenced as a proprietary document on the hard drive was Ranger's 154 Mobile Facility Plan files.  The purpose of the Plan is to have information to satisfy Coast Guard regulations and file Plans with the Coast Guard). (Id.) However, the Plan is publicly available from the Coast Guard and via a FOIA request. (Hrg. Test. Foehl).

---

[6] Created by Defendants' counsel Hart Benton, not expert Black. He created Excel spreadsheet with over 300,000 lines in it, and from that counsel created Exhibit 5.

Further, Foehl did not download any of the listed documents/files in anticipation of going to work for Wellbuilt; every file related to Ranger on the external drive came to exist on the drive in the course and scope of his employment for Ranger. (Hrg. Test. Foehl). The Defendants submitted testimony of Michael Black, a digital forensic computer expert, regarding these exhibits and the contents of Foehl's hard drive. (Hrg. Test. Black). However, as discussed on the record at the hearing, the only clear takeaway from Black's testimony is that he found no evidence that the files had been downloaded by Foehl onto the hard drive in one single event in July 2023. (Hrg. Test. Black). Allegations to the contrary are yet to be supported with reliable evidence.

Finally, Foehl turned his external hard drive over to his attorneys when this litigation commenced and so no longer has access to it, and he has not copied or downloaded any of the documents on the drive to another location. (Hrg. Test. Foehl). And Foehl's external hard drive has been made available to Ranger since that time.  In other words, there is no evidence that Foehl is in possession of any of Ranger's alleged proprietary documents.

## VI.  Analysis

### Imminence as a Threshold Consideration

Above all, injunctive relief is _targeted_. It is "forward-looking" towards a particularized and _imminent_ injury – i.e., there must be a real and _immediate_ threat of future harm ("imminence"). Gratz v. Bollinger, 539 U.S. 244, 284 (2003) (citing Adarand Constructors, Inc. v. Peña, 515 U.S. 200, 210–211 (1995)). "A person exposed to a risk of future harm may pursue forward-looking, injunctive relief to prevent the harm from occurring, at least so long as the risk of harm is sufficiently imminent and substantial."  TransUnion LLC v. Ramirez, 141 S.Ct. 2190, 2211 (2021). See also Poor and Minority Justice Assn v. Chief Judge, Tenth Judicial Circuit Court of Fla., 2020 WL 3286140, *2 (M.D. Fla. Mar. 27, 2020) ("Injunctive relief is forward-looking, seeking to prevent or right an ongoing or imminent injury in fact. Here, no such ongoing or imminent injury is alleged. This was a 'one off,'

single historical event. There is nothing to enjoin."). In this sense, an alleged past injury or harm --
*even if established* -- is insufficient, because the movant is asking the Court to stop something (else)
from *imminently* occurring –*i.e.*, a different event that is impending. Wooden v. Board of Regents of
Univ. Sys. of Ga., 247 F.2d 1262, 1293 (11th Cir. 2001). As summarized in Loper v. Lifeguard
Ambulance Service, LLC, 2021 WL 4458873, *7 (N.D. Ala. Sept. 29, 2021) (footnote omitted):

> One more rule. "[W]hen plaintiffs seek prospective relief to prevent future injuries,
> they must prove that their threatened injuries are 'certainly impending.' " *Jacobson*,
> 974 F.3d at 1245 (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 401 (2013)).
> Although plaintiffs do not have to show "that it is literally certain that the harms they
> identify will come about," they must do more than make mere "allegations of *possible*
> future injury." *Clapper*, 568 U.S. at 414 & n.5 (quotation marks and alteration omitted).
> Thus, they must establish a "material risk," *Muransky v. Godiva Chocolatier, Inc.*, 979
> F.3d 917, 928 (11th Cir. 2020) (en banc), or a "substantial likelihood" of continuing or
> future injury, *A&M Gerber Chiropractic LLC v. Geico Gen. Ins. Co.*, 925 F.3d 1205,
> 1210–11 (11th Cir. 2019).[] So "a person exposed to a risk of future harm may pursue
> forward-looking, injunctive relief to prevent the harm from occurring, at least so long
> as the risk of harm is sufficiently imminent and substantial." *TransUnion LLC v.
> Ramirez*, 141 S. Ct. 2190, 2210 (2021).

As a threshold matter, there is nothing before the Court establishing imminence regarding
Ranger's DTSA/ATSA and/or breach of contract claims against Foehl. While Ranger has had over
four (4) months to submit credible evidence of an impending immediate injury or the threat of such at
the hands of Foehl, no such evidence has been submitted.  Nothing at the three (3) day evidentiary
hearing even hinted at imminence. At best, Ranger alleges possible future injury based on speculation
as to what Foehl may do at Wellbuilt with the information "in his head." Notably, Ranger GM Clay
Turner testified -- in conclusory fashion -- that *if* Foehl does this, or *if* Foehl does that, at some point
in the future, it would "decimate" the company's entire maritime division. This is sheer speculation
and speculation lacking temporal pertinence (*i.e.* immediacy). As such, this alone is fatal to Ranger's
request for injunctive relief. Nevertheless, the Court addresses the other elements, as needed.

B.     **Substantial likelihood of success on the merits**

Even assuming *arguendo* that imminence had been established, Ranger has failed to show a substantial likelihood of success on the merits for its DTSA/ATSA or breach of contract claims.

1.     **DTSA/ATSA**

Ranger alleges that Foehl "stole," "misappropriated," and "converted" its "confidential information and trade secrets[]"in violation of the DTSA (18 U.S.C. §§ 1831) and ATSA (Ala. Code §§ 8-27-1). "In a trade secret action, the plaintiff bears the burden of demonstrating both that the specific information it seeks to protect is secret and that it has taken reasonable steps to protect this secrecy." American Red Cross v. Palm Beach Blood Bank, Inc., 143 F.3d 1407, 1410 (11th Cir. 1998) (albeit for the UTSA). "To establish a violation of the [DTSA], a plaintiff must show (1) it owns a valid trade secret [as defined in Section 1839(3)]; (2) the trade secret relates to a product or service used in, or intended for use in, interstate commerce; **and** (3) a defendant misappropriated that trade secret." La Dolfina S.A., LLC v. Meeker, 2022 WL 6507718 (S.D. Fla. Aug. 29, 2022) (citing the Pattern Civ. Jury Instr. 11ᵗʰ Cir. 11.1 (2019) (emphasis added)).

Section 1839(3) defines "trade secret" as:

> [A]ll forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing **if**—
>> (A) the owner thereof has taken reasonable measures to keep such information secret; **and**
>> (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information[.]

(emphasis added). Accordingly, the "…plaintiff must allege that it (i) 'possessed information of independent economic value' that (a) 'was lawfully owned by' the plaintiff, (b) for which the plaintiff 'took reasonable measures to keep secret,' **and** (ii) the defendant 'used and/or disclosed that

information' despite (iii) 'a duty to maintain its secrecy.' *Trinity Graphic, USA, Inc. v. Tervis Tumbler Co.*, 320 F.Supp.3d 1285 (M.D. Fla. 2018)."   Southern Field Maint. & Fabrication LLC v. Killough, 2018 WL 4701782 (M.D. Ala. Oct. 1, 2018) (emphasis added). See also Rotor Blade, LLC v. Signature Util. Services, LLC, 545 F.Supp.3d 1202, 1221 (N.D. Ala. 2021); McGriff Seibels & Williams, Inc. v. Sparks, 2020 WL 58009971, *2 (N.D. Ala. Jan. 23, 2020).

Similarly, to establish an ATSA violation, the movant bears the burden of showing the information at issue satisfies each of the requisite elements – "it maintained trade secrets, as defined in the ATSA, and that those secrets are at issue…." Rotor Blade, 545 F.Supp.3d at 1221. See also e.g., Physiotherapy Assoc., Inc. v. ATI Hldgs., LLC, 592 F.Supp.3d 1032, 1039 (N.D. Ala. Mar. 18, 2022) (referencing Ex parte Indus. Warehouse Services, Inc., 262 So. 3d 1180, 1186 n.4 (Ala. 2018)). "[N]early identical" to the DTSA, the ATSA defines a trade secret as information that: 1) is "used or intended for use in a trade or business;" 2) is "included or embodied in a formula, pattern, compilation, computer software, drawing, device, method, technique, or process;" 3) is "not publicly known and is not generally known in the trade or business of the person asserting that it is a trade secret;" 4) cannot "be readily ascertained or derived from publicly available information;" 5) is "the subject of efforts that are reasonable under the circumstances to maintain its secrecy;" **and** 6) "[h]as significant economic value." Ala. Code § 8-27-2(1) (emphasis added). Parker v. Petrovics, 2020 WL 3972761, *4 (N.D. Ala. July 14, 2020) (noting the "nearly identical" criteria between the DTSA and ATSA).

Additionally, concerning a plaintiff's "reasonable measures" to keep its information secret under the DTSA and the ATSA:

> … HB&G alleges that it took the following steps to keep its information secret: it requires employees like Russell to sign confidentiality agreements; its employee handbook instructs all employees about the importance of keeping confidential information secret; it restricts information to employees with a "business need to know"; and it password-protects its electronic systems … Accepting these allegations as true, HB&G has likely taken reasonable steps to keep its information secret. *See* 18 U.S.C. § 1839(3); Ala. Code § 8-27-2(1) *see also S. Field Maint. & Fabrication LLC v. Killough*, 2018 WL 4701782, at *6 (M.D. Ala. Oct. 1, 2018) (concluding that

instructing employees on confidentiality and marking documents confidential were "reasonable" secrecy measures under the DTSA and the ATSA.

The Court also finds that HB&G has established that the information likely cannot "be readily ascertained or derived from publicly available information" and has "significant economic value" for purposes of the ATSA, *see* Ala. Code § 8-27-2(1), and that the information "derives independent economic value ... from not being generally known" for purposes of the DTSA, *see* 18 U.S.C. § 1839(3)....

HB&G Building Prod., Inc. v. Digger Spec. Inc., 2022 WL 1913604, *4-5 (N.D. Ala. Jun. 3, 2022).

### a.   <u>Interstate Commerce</u>

Per Section 1839(3) of the DTSA, a trade secret must relate to a product or service used in, or intended for use in, interstate commerce. The ATSA likewise requires the information be used or intended for use in a trade or business. <u>Ala.</u> <u>Code</u> § 8-27-2(1). Little caselaw addresses this factor, which seems presumed, and among the parties this element appears undisputed. Additionally, Ranger asserts that it utilizes what it has identified as its trade secrets in its business (interstate commerce) – *e.g*., bid formulas and customer contacts related to its maritime services (tank cleaning business) in Alabama, Mississippi, and Georgia. Thus, this element satisfied.

### b.   <u>Valid Trade Secrets</u>

As explained in <u>HB&G Building Prod., Inc. v. Digger Spec. Inc.</u>, 2022 WL 1913604, *4-5 (N.D. Ala. Jun. 3, 2022).

… The DTSA defines trade secrets as tangible and intangible "financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes," if the owner "has taken reasonable measures to keep such information secret" and the information "derives independent economic value ... from not being generally known." *Id.* from 1839(3). ….. The ATSA defines a "trade secret" as information that (1) is "used or intended for use in a trade or business"; (2) is "included or embodied in a formula, pattern, compilation, computer software, drawing, device, method, technique, or process"; (3) is "not publicly known and is not generally known in the trade or business of the person asserting that it is a trade secret"; (4) cannot "be readily ascertained or derived from publicly available information"; (5) is "the subject of efforts that are reasonable under the circumstances to maintain its secrecy"; and (6) "[h]as significant economic value." *Id.* § 8-27-2(1).
                                        ***
… [certain] documents likely constitute trade secrets under both the DTSA and the ATSA. *See* 18 U.S.C. § 1839(3) (trade secrets are "financial, business, scientific,

> technical, economic, or engineering information, including ... formulas, designs, prototypes, methods, techniques, processes, [and] procedures"); Ala. Code § 8-27-2(1); *see also, e.g., Ex parte W.L. Halsey Grocery Co.*, 897 So. 2d 1028, 1034 (Ala. 2004) (holding that documents "used to forecast sales, to determine what prices should be quoted to certain customers, to create financial statements ... and to conduct other standard business practices" were trade secrets under the ATSA).

Determining what information constitutes a trade secret is a question of fact – one *necessarily* informed by both how Ranger has alleged, identified, and framed the information at issue (trade secrets) and the Court's factfinding and credibility determinations (based on the evidence presented at the evidentiary hearing). Because the facts are bitterly contested, the Court's factfinding role – in this instance—has overcome the assumption that Ranger's "well-pleaded allegations .... in support of the motion for a preliminary injunction are taken as true[,]" particularly when the Court – following an evidentiary hearing -- finds those allegations largely unsupported (*i.e.*, not well-plead).

Specifically, broad categorization or matters of general knowledge in the trade/industry are insufficient. For example, when a "complaint alleges .... [m]isappropriate[ion] [of] its customer lists, detailed customer profiles, buying patterns, customer needs and preferences, customer-specific pricing and services, as well as formulas, patterns, compilations, programs, devices, methods, techniques, and processes related to" [its services]… [a]t most, these are categories of trade secrets … averments [which] fail to allege the actual secrets that are the subject of the claim and Plaintiff has not filed any declarations or other evidence to elaborate on its general assertions. Without more, the Court cannot … fin[d] … Plaintiff has any trade secrets that were misappropriated." <u>Wouaff Wouaff LLC v. McElroy</u>, 2018 WL 6620601, *2 (M.D. Fla. Nov 1, 2018). As clarified in 13 Bus. & Com. Litig. Fed. Cts. § 142:10-142.11 (5th ed. Nov. 2022 Update) (footnotes omitted):

> …"Matters of public knowledge or general knowledge in an industry, or ideas which are well known or easily ascertainable, cannot be trade secrets."[ ]"[A]n employee's 'personal skills, talents or abilities … are not trade secrets' and that 'facts and information acquired' during employment can only be trade secrets if they meet the given definition.[ ]A plaintiff also needs to plead the trade secrets with sufficient particularity.[ ] …

Similarly, per <u>East West Bank v. Shanker</u>, 2021 WL 3112452, *8 (N.D. Cal. Jul. 20, 2021):

> Although a "plaintiff need not 'spell out the details of the trade secret,'" *Autodesk, Inc. v. ZWCAD Software Co.,…, 2015 WL 2265479, at \*5 (N.D. Cal. May 13, 2015)*, the plaintiff must "describe the subject matter of the trade secret with sufficient particularity to separate it from matters of general knowledge in the trade or of special knowledge of those persons skilled in the trade...[and] must clearly refer to tangible trade secret material instead of referring to a system which potentially qualifies for trade secret protection." *InteliClear, LLC v. ETC Glob. Holdings, Inc.*, 978 F.3d 653, 658 (9th Cir. 2020) (internal citations, quotation marks, and alterations omitted).

Thus, "it is insufficient to describe the trade secrets by generic category ... Rather, defendant must identify the specific characteristics of each trade secret ... [i]t must also describe with reasonable particularity all of its trade secrets, including those involving 'business methods, know-how, machines, manufacturing process and procedure, marketing information, pricing data ...") Knights Armament Co. v. Optical Sys. Tech. Inc., 254 F.R.D.463, 467 (M.D. Fla. Nov. 20, 2008) (quoting Del Monte Fresh Produce Co. v. Optical Sys. Tech., Inc., 148 F.Supp.2d 1322 (S.D. Fla. 2001)).  See also Whetstone Hldgs., LLC v. Thorell, 2014 WL 11906593, \*4 (S.D. Fla. Feb. 5, 2014) ("a plaintiff must describe a trade secret with 'reasonable particularity[]").

*Cf* G.W. Henssler & Assoc. Ltd. v. Marietta Wealth Mgmt, LLC, 2017 WL 6996372, \* 4 (N.D. Ga. Oct. 23, 2017) (the plaintiff's customer list qualified as a trade secret because the plaintiff demonstrated that the list "contain[ed] sensitive client information such as names, addresses, telephone numbers, monetary amounts and notes including needs or preferences ..."); Ex parte W.L. Halsey Grocery Co., 897 So.2d 1028, 1034 (Ala. 2004) (documents "used to forecast sales, to determine what prices should be quoted to certain customers, to create financial statements ... and to conduct other standard business practices" were trade secrets under the ATSA).

As alleged, Ranger identifies its trade secrets as follows: "including *without limitation* communications from clients with requests for and requirements of bids for open contracts, *historical* and current draft bids, contracts, client/customer lists, client/customer documents and data, customer/client information, pricing formulas, 154 Mobile Facility Plans, processes, procedures, employee contact information, marketing strategies, strategic short and long term plans, *e-mails, texts,*

*etc*.[]" and "*all documents and information that is not public*, *policies … techniques, methods*, pricing information … customer information (including individual points of contact and customer preferences as determined based on information and data Ranger has gathered and accumulated over a number of years regarding each of its clients/customers)…" (Doc. 15 at 3, 27 (emphasis added)). Thus, Ranger identifies its trade secrets as all bids it has ever had, all communications to/from clients it has ever had, all contracts it has ever had, all of its emails, all of its texts, all of its customer information, all of its "processes, procedures … policies, methods," etc., and "without limitation."

A plaintiff's mere identification of "operations procedures," "software," "hardware," "database," "all information concerning" a product/project, is insufficient. See, e.g., Decurtis, LLC v. Carnival Corp., 2021 WL 1968327, *7 (S.D. Fla. Jan. 6, 2021) ("there is nothing specifically identified" and noting "*VVIG, Inc*., 2019 WL 5063441, at *4 ("Couching specific terms within a sweeping definition is insufficient to state a trade secret claim because doing so fails to notify Counter-Defendants which trade secret or secrets they allegedly misappropriated.") (emphasis in original) (citing *Taxinet, Corp. v. Leon*, 2018 WL 3405243, at *3 (S.D. Fla. July 12, 2018)). More specificity is required[]"); Taxinet, *supra* (finding insufficient the complaint's defined of trade secrets at issue as "confidential business information, processes, techniques, software applications, and business characteristics, including present, future, and proposed services, and business model[]" even when including the *s*pecific characteristics of the business model at issue). See, e.g., Bombardier Inc. v. Mitsubishi Aircraft Corp., 383 F. Supp. 3d 1169, 1178 (W.D. Wash. 2019) (a complaint "need not spell out the details of the trade secret," but the plaintiff "must identify the trade secret with sufficient particularity ... to permit the defendant to ascertain at least the boundaries within which the secret lie[]"); Alta Devices, Inc. v. LG Elect., Inc., 343 F.Supp.3d 868, 881 (N.D. Cal. 2018) (quotation marks omitted) (broad reference to "client information" does not "describe the subject matter of the trade secret with sufficient particularity to separate it from matters of general knowledge in the trade or of special persons who are skilled in the trade[]").

At the evidentiary hearing Ranger identified its trade secrets more narrowly: 1) its 154 Mobile Facility Plan on Foehl's external hard drive; 2) its past bids with contract, pricing, and financial information on Foehl's external hard drive; 3) the customer contacts and text messages on Foehl's Ranger supplied cell phone; 4) emails to/from Foehl via Ranger's email address; and 5) its "secret" bid formula. Additionally, Ranger argues that an employee like Foehl cannot take trade secrets he has memorized "in his head" while employed by his former employer, with him to the next employer, to then weaponize and use freely to unlawfully disadvantage and compete against his prior employer.

Concerning Ranger's 154 Mobile Facility Plan, Ranger alleged that Foehl "stole" its 154 Mobile Facility Plan and gave it to Wellbuilt, but there is no evidence of this. (Hrg. Test. Elana Turner). Additionally, as revealed by the Defendants, the Plan is public information given its FOIA request to the U.S. Coast Guard (Def's Hrg. Ex. 7) and receipt of the Plan in response (i.e., the Plans do not constitute something "not publicly known and is not generally known in the trade or business," cannot "be readily ascertained or derived from publicly available information," are not "the subject of efforts that are reasonable under the circumstances to maintain its secrecy," and/or do not "derive[] independent economic value … from not being generally known." Ala. Code § 8-27- 2(1); 18 U.S.C. § 1839(3)). Ranger offered nothing at the hearing to conclude otherwise.

As for Ranger's past bids, contracts, pricing, and financial information, Foehl testified that Ranger bid sheets that he prepared (pricing information) exist on the external hard drive but not the hundreds of pages supporting materials revealing the specifications behind the bids (*i.e.,* the bid result but not the bid process). And all parties agree that the bid sheet/result is what Ranger provides to the customer to review. Ranger failed to submit any evidence at the hearing indicating that Foehl possessed Ranger's detailed specifications on the hard drive, and without such, a person/customer would not know what the bid corresponds to as a number of other things are involved that are not revealed by simply reviewing the bid sheet. (Hrg. Test. Elana Turner).

With regard to customer contacts and text messages on Foehl's Ranger supplied cellphone, this information was what Foehl saved to his phone while employed with Ranger for which there is no evidence of such being a company trade secret, particularly as certain customer information is ascertainable through outside sources.  Additionally, the evidence indicates that Foehl returned all Ranger related customer contacts and text messages on the cellphone to his counsel and then deleted them all from his personal phone; Foehl did not provide any customer contacts or text messages to Salley or Wellbuilt; and Ranger has now, in hand, all of its customer contacts and text messages. (Hrg. Test. Foehl; Hrg.Test. Elana Turner).

As for the emails to/from Foehl's Ranger e-mail address, Ranger alleges that every such email was confidential and a trade secret. However, at the evidentiary hearing, Elana Turner testified that she did not even understand this allegation by Ranger and admitted that personal emails would not be confidential or trade secrets. (Hrg. Test. Elana Turner). Additionally, Ranger has access to all of its employees' emails and has failed to show that any constitute a trade secret.

Ranger identifies its bid formula as a trade secret. However, there is little evidence indicating that Ranger's bid formula is novel, unique in the industry, involves secret calculations or constitutes a secret formula, could not be discerned or duplicated by an experienced maritime bid estimator, or is materially different from other companies performing the same services. But evening assuming Clay's bid formula is a trade secret, there is no credible evidence that Foehl has the formula, knows the formula or ever used the formula.

The information contained in Foehl's head is not Ranger's trade secret. Foehl's maritime bidding process did not originate with Ranger, but was already established (and "vetted") by the time he became the company's Maritime Manager. Additionally, Foehl's bidding process was not Ranger's described "secret formula" but was his own process, developed since he bid jobs at LES. And while Ranger may have encouraged Foehl to use different data/information to bid its jobs during the last 6 months of his employment, Foehl did not use any Ranger data/information but continued to use and

rely on his own personally developed bid process. There is simply no evidence that Foehl's "mind" contains Ranger's secret bid formula or that Foehl possesses the secret formula in any other manner.

**c.   <u>Misappropriation</u>**

The DTSA defines misappropriation of a trade secret as follows:

(A) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or
(B) disclosure or use of a trade secret of another without express or implied consent by a person who—
> (i) used improper means to acquire knowledge of the trade secret;
> (ii) at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was—
>> (I) derived from or through a person who had used improper means to acquire the trade secret;
>> (II) acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret; or
>> (III) derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy of the trade secret or limit the use of the trade secret; or
> (iii) before a material change of the position of the person, knew or had reason to know that—
>> (I) the trade secret was a trade secret; and
>> (II) knowledge of the trade secret had been acquired by accident or mistake

Section 1839(6) notes that "[i]mproper means" includes "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means." The ATSA defines misappropriation similarly. As addressed in <u>M5 Mgt. Servs., Inc. v. Yanac</u>, 428 F.Supp.3d 1282, 1289-1290 (N.D. Ala. Dec. 12, 2019):" … misappropriation is defined in relevant part as 'acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means.' 18 U.S.C. § 1839(5)(A)."

Additionally, as to both the DTSA and ATSA – and as summarized in <u>HB&G Building Products, Inc. v. Digger Specialties Inc</u>., 2022 WL 1913604, *4-6 (N.D. Ala. Jun. 3, 2022):

> … The DTSA …. Prohibited "misappropriation" includes both "acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means" and "disclosure or use of a trade secret" without the owner's consent. *Id.* § 1839(5)(A)–(B). Similarly, the ATSA imposes civil liability upon a person who "discloses or uses the trade secret of another, without a privilege to do so," …. :

> (1) That person discovered the trade secret by improper means;
> (2) That person's disclosure or use constitutes a breach of confidence reposed in that person by the other;
> (3) That person learned the trade secret from a third person, and knew or should have known that (i) the information was a trade secret and (ii) that the trade secret had been appropriated under circumstances which violate the provisions of (1) or (2).

Ala. Code § 8-27-3…..

Similarly, under the ATSA, a person who discloses or uses the trade secret of another, without a privilege to do so, is liable to the other for misappropriation of the trade secret if: (a) [t]hat person discovered the trade secret by improper means; (b) [t]hat person's disclosure or use constitutes a breach of confidence reposed in that person by the other; (c) [t]hat person learned the trade secret from a third person, and knew or should have known that (i) the information was a trade secret and (ii) that the trade secret had been appropriated under circumstances which violate the provisions of (1) or (2), above; or (d) [t]hat person learned the information and knew or should have known that it was a trade secret and that its disclosure was made to that person by mistake." Parker, 2020 WL 3972761, *6 (quoting Ala. Code § 8-27-3).

In the motion, Ranger alleges that Foehl -- without authorization -- misappropriated and stole its trade secrets by: 1) transferring such on to an external hard drive; 2) deleting such from the company server, e-mail server, laptop, and phone; and 3) converting such for his, Salley, and Wellbuilt's use, to unlawfully compete with Ranger. (Doc. 1 at 26-34).  Ranger alleges that as a result, it missed deadlines for bid submissions and had to prepare bids without the benefit of its historical bid information, resulting in damages and irreparable harm, which will continue in the future. (Id.)  As previously discussed in the findings of fact, these allegations lack sufficient evidentiary support to warrant a preliminary injunction.

Ranger adds that Foehl knowingly stole, or without authorization appropriated, took, and carried away its trade secrets per 18 U.S.C. § 1832(a)(1), because he admitted taking/deleting such

from company devices. (Doc. at 27-28)). Ranger contends that Foehl misappropriated because he "stole," "misappropriated," and "converted" its "confidential information and trade secrets" as follows: 1) he "copied thousands of Ranger's files" to his personal external hard drive; 2) he "copied" text messages, emails, and customer contacts from his Ranger phone, and 3) he "stole" draft bids from the company before it had an opportunity to submit them. Id. Even if the Court assumes *arguendo* that such information qualifies as trade secrets, Ranger's misappropriation claims lack merit.

At the outset, there is no evidence that Foehl acquired any trade secret of Ranger's by improper means; and there is no evidence that Foehl copied and/or deleted _any_ files – much less thousands -- from Ranger's company server. Instead, the evidence indicates that Foehl historically created and maintained Ranger files on his personal hard drive (and possessed them in that way). But, the existence of such on Foehl's hard drive does not equate to misappropriation especially as such were stored in the scope and course of his work when he was out in the field and unable to access the company server. Ranger management was also aware of this practice by Foehl and, at some point, even expressed gratitude for the practice when a Ranger laptop crashed as such provided the company with access to bids otherwise not retrievable. Moreover, there is no evidence that the existence of the 154 Mobile Facility Plans on Foehl's personal external hard drive was part of a scheme for Wellbuilt to compete with Ranger and those Plans are publicly available via a FOIA request, and so cannot constitute a trade secret which may have been misappropriated. Further, as to Ranger's past bids, contracts, pricing and financial information, the evidence indicates that only information contained on the hard drive is the bids Foehl created and the pricing results given to customers (already disclosed), not the underlying hundreds of pages of specifications that led to the pricing results. At most then, Foehl possessed certain confidential Ranger information on his external hard drive.

Apart from possession, however, Ranger fails to substantiate that Foehl *used* or *disclosed* such information through *improper* means. This is significant. An "'allegation that a defendant merely continues to possess a trade secret is not an allegation the defendant acquired, disclosed, or used a trade

secret—the DTSA's definitions of misappropriation." McGriff Seibels & Williams, Inc. v. Sparks, 2020 WL 5809971, at *3 (N.D. Ala. Jan. 23, 2020). *Accord* AWP, Inc. v. Henry, 2020 WL 6876299, *4 (N.D. Ga. Oct. 28, 2020) ("the mere possession of a trade secret is not enough to state a claim of threatened misappropriation."); Del Monte Fresh Produce Co. v. Dole Food Co., Inc., 148 F. Supp. 2d 1326, 1338 (S.D. Fla. 2001) ( "[m]isappropriation of trade secrets is an intentional tort" and "[a]s such, [plaintiff] must show more than mere possession of a trade secret by" the defendant). At the hearing, Ranger failed to submit any evidence indicating Foehl's use or disclosure of the information on his external hard drive. And, Foehl no longer even possesses the hard drive as he turned over such to his counsel some time ago and Ranger has had access to the drive since that time.

Additionally, Ranger alleges that Foehl "copied" text messages, emails, and customer contacts from his Ranger phone as follows: 1) "copied, misappropriated, and stole all Ranger's confidential customer information including contacts and contact information from the Ranger phone"; 2) "copied and misappropriated all Ranger's employee contact information" from the Ranger phone; 3) "[C]opied, misappropriated, and stole all Ranger's confidential text messages from the Ranger phone"; and 4) "copied, misappropriated, and stole those confidential e-mails sent to and/or from Foehl's Ranger e-mail address" from the Ranger phone. (Doc. 15). Ranger has submitted insufficient evidence in support of these assertions. At best, Ranger argues that after Foehl turned in his Ranger supplied phone, it discovered that data had been deleted from the phone. This position by Ranger ignores the fact that Foehl used this phone for approximately six (6) years as both a business and personal cell phone such that it accumulated personal information (e.g., photos of his grandchildren) and so before returning it he attempted to delete his *personal data* from the phone. Regardless, this only shows deletion of data by Foehl, not use and/or acquisition of same under improper circumstances.

Ranger alleges that Foehl "stole" draft bids from the company before it had an opportunity to submit them. Ranger asserts that because it could not find any bids for certain jobs on the company system after Foehl left, he misappropriated and stole them. Ranger offers no evidence in support of

this assertion, only speculation.  Further, Ranger has submitted no evidence of disclosure.  In sum, Ranger has failed to show a substantial likelihood of success on the merits of its misappropriation of trade secret allegations.

### 2.   **Employment Agreement**

Ranger moves for entry of a temporary and permanent injunction based on Foehl's alleged breach of certain non-compete and non-solicit covenants of his employment agreement. The parties do not dispute that Foehl executed the referenced employment agreement with Ranger.  Additionally, a review of the agreement indicates it is governed by Alabama law.

Specifically, Ranger asserts that, in violation of the non-solicitation provisions of the agreement Foehl: 1) between July 11-14, 2023 contacted and solicited three (3) Ranger employees inviting them to work for Wellbuilt; 2) left Ranger to work directly for a competitor in Mobile County, AL (Wellbuilt); and 3) violated his employment agreement by soliciting Ranger's customer's business.

At the outset, the DTSA bars entry of an injunction that "prevent[s] a person from entering into an employment relationship[]" and forbids entry of an injunction that would "conflict with an applicable State law prohibiting restraints on the practice of a lawful profession, trade, or business." JAGER, TRADE SECRETS LAW, 1 TRADE SECRETS LAW § 4:9 (Oct. 2022 Update). In Alabama, the current restraint-of-trade statute is codified at Alabama Code §§ 8-1-190, et seq., which states that "[e]very contract by which anyone is restrained from exercising a lawful profession, trade, or business of any kind otherwise than is provided by this section is to that extent void." Ala. Code § 8-1-190(a). However, Section 190(b) lists six (6) exceptions to this general prohibition on restrictive covenants; one exception allows for a "contract between two or more persons or businesses or a person and a business limiting their ability to hire or employ the agent, servant, or employees of a party to the contract where the agent, servant, or employee holds a position uniquely essential to the management, organization,

or service of the business." Ala. Code § 8-1-190(b)(1). Per Ranger, Section 8-1-190(b)(1) provides the state law avenue for relief.

According to the Defendants, Ranger cannot establish a substantial likelihood of success on the merits of his contractual claim based on the non-solicitation provision of the employment agreement.  (Doc. 25 at 28-30.  Per Defendants, the non-solicitation provision "does not fit within this exception and is … void because it is not limited to solicitations of an "agent, servant, or employee [who] holds a position uniquely essential to the management, organization, or service of the business." (Doc. 25 at 29). Defendants highlight that the agreement extends to "any of [Ranger's] employees, agents, servants, and representatives" regardless of the nature of their position. Indeed, per Ranger, the company seeks to enforce the employee non-solicitation covenant as to certain individuals who are clearly not "uniquely essential" to Ranger's management or service, including a tank cleaner and a truck driver. (Doc. 15). Additionally, Defendants argue the non-solicitation provision does not fall within Section 8-1-190(b)(1)'s narrow exception to Alabama's general prohibition of restraints of trade, it is void in its entirety as a matter of law. Ala. Code § 8-1-190(a); Cajun Steamer Ventures, LLC v. Thompson, 402 F. Supp. 3d 1328, 1341 (N.D. Ala. 2019) (rejecting a request to reform an employee non-solicitation clause (blue penciling the contract) and voiding the contract instead because the clause was "not unreasonable in duration, but unreasonable in substance, [and] the statute does not instruct the court to merely void the unreasonably broad portion of the provision[]").

The Court need not determine at this time whether the non-solicitation clause violates Alabama law.  This is because there is no credible evidence that Foehl solicited Ranger employees and/or Ranger customers – much less "between July 11-14, 2023 contacted and solicited three (3) Ranger employees inviting them to work for Wellbuilt."

Second, Ranger alleges that Foehl is in violation of the Agreement's non-compete provision because he is working for Wellbuilt, "a competitor in Mobile County, Alabama." (Doc. 15). In response, Defendants argue that this provision is void as against Alabama law because the permitted

restrictive covenants in § 8-1-190(b) provide that "employee of a commercial entity may agree with such entity to refrain from carrying on or engaging in a similar business within a specified geographic area so long as the commercial entity carries on a like business therein, subject to reasonable restraints of time and place[]" Ala. Code § 8-1-190(b)(4), but the agreement's non-compete provision does not fall within the scope of § 8-1-190(b)(4). (Doc. 25 at 31). Defendants also argue that Ranger has not identified a "protectible interest" in its business to permit enforcement of the non-compete against Foehl, as required under Alabama law or deemed unenforceable. See, e.g., Concrete Co. v. Lambert, 510 F. Supp. 2d 570, 580–581 (M.D. Ala. 2007) (collecting cases) (declining to enforce a non-compete due to plaintiff's failure to demonstrate a sufficiently unique protectable interest and failure to submit evidence indicating that the nature or manner of its business operations differ from competitors, noting "[m]ore importantly … [plaintiff] does not have a protectible interest in not having competition[]"); Amanda Howard Real Est., LLC v. Lee, 2023 WL 4281468, *2 (Ala. Jun. 30, 2023) (while Section 8-1-190 provides an "exception for employee noncompete agreements," Alabama courts "continue to apply that exception narrowly in favor of competition[]").

Even if Ranger established a protectible interest beyond that of merely avoiding competition, Ranger failed to present sufficient evidence on its claim of breach to warrant a preliminary injunction. Foehl works for Wellbuilt's *Louisiana* maritime tank cleaning market – i.e., a State where Ranger has no business and has no protectible interest. However, the nature of Foehl's employment does not require that he be physically present in Louisiana all the time and much of his work (communicating with Louisiana customers and preparing bids for Louisiana projects) can be done anywhere (remotely). Given this, and due to economic and practical considerations, Foehl has and plans to remain physically present in Mobile County (where his life and family are), including at the Wellbuilt AL facility, and travel to Louisiana when needed.  **Ranger has failed to convince this Court that Foehl's presence in Mobile while working exclusively on Louisiana contracts is violative of the non-compete agreement.**

Further, even assuming *arguendo* the propriety of the Agreement and that it comports with Alabama public policy, Ranger must establish that Foehl has violated these specific covenants to succeed on its claim. There is presently no credible evidence before the Court that Foehl violated the agreement -- that he solicited Ranger's employees, that he solicited Ranger's competitors, and/or that he used Ranger's confidential information and competed in the same/similar industry in geographically restricted areas.

## C.   **Imminent Irreparable Injury, Balancing of the Harms, Prejudice**

As to the three (3) remaining preliminary injunction factors, such are essentially irrelevant at this juncture as all factors must be established. Because the Court cannot conclude that Ranger has established a substantial likelihood of success on the merits of its DTSA/ATSA claims and/or breach of contract claim there is no need to address the balancing of harms or prejudice.

Nevertheless, the Court notes that Ranger argues as follows in support of establishing irreparable injury: 1) Ranger is suing Foehl to keep him from competing against Ranger and putting the company at a business disadvantage based on his knowledge of company trade secrets and the terms of the employment Agreement; 2) Ranger believes that Foehl already damaged the company because it recently lost a maritime job from Miller Maritime; and 3) the Coastal Alliance bid establishes irreparable injury. Ranger has wholly failed to support its allegation of irreparable injury with evidence, instead relying on speculation. In sum, Ranger has wholly failed to establish irreparable injury that is imminent and immediate if Foehl is not enjoined from working for Wellbuilt in the manner he is currently employed.

## V.   **Conclusion**

Based upon the foregoing, it is **ORDERED** that Ranger's motion for entry of a preliminary injunction is **DENIED**; and Defendants' Motion to Dismiss (Doc. 18) is **MOOT.**

On a final note, the parties are not diverse in this case, as they are all Alabama citizens. As such, to the extent that the federal DTSA claims in this case are found unsupportable, the Court would be disinclined to exercise supplemental jurisdiction over any remaining state law claims and this case would likely be dismissed due to a lack of federal subject matter jurisdiction.

**DONE** and **ORDERED** this the **19th** day of **October 2023**.

/s/ Kristi K. DuBose
**KRISTI K. DuBOSE**
**UNITED STATES DISTRICT JUDGE**